The GIFT COLLECTION, LTD., Plaintiff,

v.

The SMALL BUSINESS ADMINISTRATION, Defendant.

Civ. A. No. 1:87–CV–2560–JOF.

United States District Court, N.D. Georgia, Atlanta Division.

Jan. 10, 1989.

T. Jackson Bedford, Jr., Andrew R. Kirschner, Bedford, Kirschner & Venker, Atlanta, Ga., for plaintiff.

Albert L. Kemp, Jr., Office of the U.S. Atty., Atlanta, Ga., for defendant.

## ORDER

FORRESTER, District Judge.

This matter is before the court on the parties' cross motions for summary judgment. Fed.R.Civ.P. 56.

## I. STATEMENT OF FACTS.

This is an action to cancel a security deed which plaintiff contends was executed with defendant's actual or constructive knowledge by an individual without authority to bind plaintiff. The parties to this action are plaintiff The Gift Collection, Ltd., a corporation organized and existing under the laws of the State of Georgia with its principal place of business in DeKalb County, Georgia; and defendant the Small Business Administration, an agency of the United States. The court's jurisdiction to hear this action is based upon 15 U.S.C. § 634(b)(1) and 28 U.S.C. § 1346(a)(2). The following statement of facts is based upon the court's review of the record including the parties' briefs and evidentiary materials submitted therewith.

In the summer of 1984, KKS Transportation, Inc. (hereinafter "KKS") applied through North Georgia Savings and Loan Association to defendant for a guarantied loan in the amount of $500,000. The loan would be made by the savings and loan association and guarantied by defendant. After consideration, however, defendant notified KKS in July of 1984 of its decision to reject KKS' application for, among other reasons, insufficient collateral. Defendant was thereafter contacted by KKS' attorney, Alan R. Turem, who requested "further review" of KKS' application and inquired into the amount of collateral required "to enhance the possibility of [KKS'] application being approved."

In August of 1984, KKS reapplied to defendant through Southern National Bank

(hereinafter "the bank") for a guarantied loan in the amount of $400,000. On September 13, 1984, KKS' application was approved and defendant agreed to guaranty ninety percent of the requested loan. A closing of the transaction was thereafter scheduled for October 11, 1984 to be held at the bank's offices. It is plaintiff's contention that KKS' reapplication was approved by defendant despite no change in KKS' financial condition since the filing of its original application. Defendant contends that it approved KKS' reapplication based on additional collateral, including real property owned by plaintiff located at 3400 Buford Highway in Atlanta, Georgia.

As originally drafted, the documents prepared for the October 11, 1984 closing indicate that the loan was to be personally guarantied by KKS' attorney, Alan R. Turem, and by plaintiff's corporate president, Gwyn Turem. At the closing, however, the bank became aware that Alan Turem would not be personally guarantying the KKS loan and that the collateral to secure the loan was owned by plaintiff. The bank subsequently notified defendant of these facts and the documents were modified in such a way as to designate plaintiff as guarantor of the loan. In addition, a deed to secure debt was executed pledging the Buford Highway property as security for the KKS loan. It is this security deed which the plaintiff seeks to cancel by this action.

Both the guaranty agreement and the security deed were executed on plaintiff's behalf by Alan R. Turem as plaintiff's corporate vice president. Mr. Turem's authority to execute these documents is evidenced by a corporate resolution captioned "Minutes of a Special Meeting of the Board of Directors of the Gift Collection, Ltd." This resolution, signed by Nora Scott as secretary and Mr. Turem as vice president, provides:

> RESOLVED, that the secretary of the corporation and all other officers of the corporation are hereby duly authorized to sign on behalf of the corporation to pledge, hypothecate, or otherwise lend its collateral of the property currently held by the Gift Collection, Ltd., and to sign any and all documents necessary to effect said lien. This is for a loan of $400,000 to pledge said property as part of an SBA financing program on behalf of KKS Transportation, Inc.

Plaintiff's Exhibit 51. Plaintiff challenges Mr. Turem's authority to execute the guaranty and security deed on several grounds, however. First, plaintiff notes that in addition to being plaintiff's corporate president, Gwyn Turem is plaintiff's sole director. This is significant since the above-quoted resolution makes no reference to Ms. Turem and does not bear her signature. In addition, plaintiff denies that any meeting of the "Board of Directors" took place or that any such resolution was otherwise reached. Second, plaintiff asserts that despite the fact Mr. Turem signed the resolution as plaintiff's vice president, he was neither an officer nor director of the plaintiff corporation. Notwithstanding any defects in the corporate resolution or in Mr. Turem's authority to bind plaintiff, the guaranty and security deed were accepted as executed and the KKS loan closed.

In October of 1985, KKS defaulted on the loan. Defendant thereafter conducted a "legal sufficiency review" to determine whether the bank disbursed and closed the loan in compliance with defendant's loan authorization and thus whether defendant was obligated to purchase the loan as agreed. In so doing, defendant noted (1) that the security deed "must" be reexecuted and rerecorded with the names of corporate officers, and (2) that the security deed's validity is "questionable." Defendant asserts that these concerns were addressed to its satisfaction by Mr. Turem's August 29, 1986 affidavit which confirmed that his signature appears both on the security deed and the corporate resolution. Though the defendant apparently refused to honor the guaranty agreement in April of 1986, the KKS loan was subsequently assigned by the bank to defendant September 16, 1986. On October 27, 1987, plaintiff was notified of a public sale of the Buford Highway property. This action followed.

## II. CONCLUSIONS OF LAW.

Courts should grant motions for summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Under Rule 56, the movant bears the initial burden of asserting the basis for his motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This does not require that he negate his opponent's claim, however. *Id.* Rather, the movant may discharge his burden by merely "showing—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. at 2553. When this burden is met, the non-moving party is then required "to go beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. Where, as here, the parties have filed cross motions for summary judgment, each must come forward with specific evidence of every element essential to its case so as to defeat the other's motion and to demonstrate its entitlement to judgment as a matter of law.

### A. *Actual Authority*.

█ The parties agree that the ultimate resolution of this dispute depends on the court's application of certain provisions of the Georgia Business Corporation Code, O.C.G.A. § 14–2–1, *et seq*. In this regard, section 14–5–7 provides as follows:

Instruments executed by a corporation conveying an interest in real property ... when signed by the president or vice president and attested or countersigned by the secretary ... of the corporation with the corporation's seal attached shall be conclusive evidence that said officers signing are duly authorized to execute and deliver the same.

The undisputed facts of record show that the deed in question was signed by Alan R. Turem as plaintiff's corporate vice president, attested to or countersigned by Nora Scott as plaintiff's corporate secretary, and bore plaintiff's corporate seal. It would thus seem that Mr. Turem's authority to execute the deed on plaintiff's behalf has been conclusively established. As alluded to previously, however, it is plaintiff's contention that Mr. Turem was *not* its vice president when he executed the deed and other loan documents and thus section 14–5–7 is unavailable to defendant to supply authority where it could not possibly have existed. The only two cases interpreting section 14–5–7 which the court has been able to locate support plaintiff's argument. In *Village Creations, Ltd. v. Crawfordville Enterprises, Inc.*, 232 Ga. 131, 206 S.E.2d 3 (1974), the Georgia Supreme Court determined that a security deed lacking the requisite corporate seal was invalid as having been executed by a corporate officer without authority to do so. In so doing, the court stated, "If the seal does not appear upon a deed executed by *the* president [or vice president] of a corporation and attested [or countersigned] by the secretary, there is no presumption as to the officer's authority to execute it (emphasis supplied)." 232 Ga. at 133, 206 S.E.2d 3.

Similarly, in *In the Matter of Pope and Lord, Inc.*, 721 F.2d 1321 (11th Cir.1983), the Eleventh Circuit Court of Appeals affirmed the lower court's decision declining to allow the appellant bank a security interest in certain real property of the debtor corporation. In so doing, the court concluded that strict compliance with section 14–5–7 was a prerequisite to a valid corporate conveyance. Because "[t]he deed was not executed by those persons necessary to make a proper corporate conveyance under Georgia law," the court held that the deed was invalid and unenforceable. 721 F.2d at 1322–23. Based on this authority, the court concludes that unless it is established that the security deed in question (1) was signed by plaintiff's president or vice president; (2) was attested or countersigned by plaintiff's secretary; and (3) bore plaintiff's corporate seal, defendant cannot rely upon section 14–5–7 to supply the requisite authority on Mr. Turem's part to bind plaintiff. A question of fact precludes summary judgment for either party on this issue.

In support of its contention that Mr. Turem was plaintiff's corporate vice president

when he executed the security deed on its behalf, defendant places great emphasis on the following response to its first interrogatory number four:

> From its inception through approximately 1986 the officers of [plaintiff] are believed to be: Gwyn Turem—president; Alan Turem—vice president; Selma Gordon—secretary/treasurer. Alan Turem is no longer a vice president. Moreover, Alan Turem has had possession of the corporate books and records, but it is believed by plaintiff that he has misplaced same. The above information is predicated on the best information and belief of the plaintiff at the present time. Further information should be requested directly from Mr. Turem. The area of responsibility for each statutory corporate officer was as established by law. Mr. Turem acted as corporate general counsel in his capacity as vice president.

Defendant's Exhibit J. This response is accompanied by the affidavit of Gwyn Turem wherein Ms. Turem testifies that "Plaintiff's response[s] to defendant's first interrogatories ... are true and correct." *Id.* While this would otherwise seem to resolve the issue, plaintiff now asserts that Ms. Turem's response to defendant's interrogatory is inaccurate. Ms. Turem has since testified that,

> The only officers of [plaintiff] during 1984 were me, Gwyn G. Turem, president, Nora Jordan (maiden name "Scott"), secretary, as evidenced by the records of the Secretary of State.... During 1984, Alan R. Turem generally represented the Gift Collection as its attorney.

> At no time during 1984 was Mr. Turem a vice president or any other officer of [plaintiff], nor was he authorized by me as president or director to execute any security deed on behalf of [plaintiff] with respect to the SBA guarantied loan which is the subject matter of this action.

Gwyn G. Turem Aff., ¶¶ 3–5. Defendant understandably argues that plaintiff should

be bound by its verified response to defendant's discovery request. This argument is contrary to principles of summary judgment, however. In considering a motion for summary judgment, the court is enjoined to consider *all* the evidence before it and cannot disregard a party's affidavit merely because it conflicts with earlier deposition testimony or other discovery responses. *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 893 (5th Cir.1980). The inconsistency is for the ultimate fact-finder to resolve: "An opposing party's affidavit should be considered although it differs from or varies his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." *Id.* (quoting 6 *Moore's Federal Practice* ¶ 56–15[4] (2d Ed.1971)). For this reason, and because the records of the Secretary of State support plaintiff's contention, plaintiff's Exhibit 3,[1] the court concludes that a question exists as to whether Alan R. Turem was in fact acting as plaintiff's corporate vice president when he executed the security deed on plaintiff's behalf.

### B. *Apparent Authority.*

Under the Georgia Business Corporation Code, third parties are legally justified in relying on the authenticity of documents purportedly executed on the corporation's behalf if certain conditions are met. Section 14–2–4 provides,

> (a) With respect to any contract, conveyance, or other similar document executed by and on behalf of a corporation, domestic or foreign, the presence of the corporate seal, or facsimile thereof, attested by the secretary or an assistant secretary of the corporation shall attest:

> > (2) that any officer of the corporation executing the document does in fact occupy the official position indicated, that one in such position is duly authorized to execute such document on behalf of the corporation, and that the

---

1. O.C.G.A. § 14–2–350 requires that each domestic corporation in the State of Georgia file an annual registration setting forth, *inter alia,* "the names and respective addresses of the three principal officers of the corporation." Plain-

tiff's Exhibit 3 is a certified annual registration form indicating that plaintiff had no corporate vice president between March 19, 1984 and April 1, 1987.

signature of such officer subscribed thereto is genuine; . . . .

(b) When the seal of a corporation, or facsimile thereof, is affixed to any document and is attested by the secretary or an assistant secretary of a corporation, a third party without knowledge, or reason to know, to the contrary may rely on such document as being what it purports to be.

Thus, if the security deed (1) bears plaintiff's corporate seal (2) attested by its corporate secretary, defendant is legally justified in relying on Mr. Turem's apparent status as corporate vice president and authority to bind plaintiff unless (3) it knew or had reason to know facts to the contrary.

■ Section 14–2–4 is clearly unavailable to defendant. While the security deed bears plaintiff's corporate seal arguably attested by plaintiff's corporate secretary, as well as the signature of Alan R. Turem on behalf of plaintiff, it does *not* indicate that Mr. Turem signed the document in any particular capacity. Section 14–2–4(a)(2) clearly requires that the supposed corporate officer's official position be indicated on the document before any party may rely thereon. *See Computer Maintenance Corp. v. Tilley*, 172 Ga.App. 220, 221, 322 S.E.2d 533 (1984) (requirements of section 14–2–4 not met where nothing on face of document indicates signatory's official capacity).[2]

■ Moreover, the court finds that a question of fact exists as to whether defendant knew or had reason to know that the security deed was not properly executed. First, plaintiff identifies and presents a letter dated October 12, 1984; i.e., the day after the KKS loan was closed, between bank vice president Thomas B. Glendinning and defendant wherein Mr. Glendinning states,

> Inasmuch as [plaintiff] was the entity pledging its real estate as collateral towards the [KKS] loan, and not Mr. and Mrs. Turem[,] Mr. and Mrs. Turem took the position that they were willing for the corporation to be the guarantor, but not themselves individually.
>
> Mr. Turem is not a stockholder of the corporation nor is he an officer of the corporation at this time.

Plaintiff's Exhibit 54. Defendant argues that by the last sentence quoted above, Mr. Glendinning was referring to KKS and not plaintiff. Indeed, Mr. Glendinning has testified to this effect. Glendinning Aff., ¶ 5. The court believes, however, that since both corporations were mentioned in the preceding paragraph, the above-quoted language can reasonably be interpreted as referring to either plaintiff or KKS. Mr. Glendinning's subsequent testimony, though extremely persuasive, is properly reserved for the ultimate fact-finder who must determine from all the evidence whether defendant knew or should have known Mr. Turem's relationship to plaintiff and/or authority to execute the security deed.

Second, plaintiff presents a "pre-purchase report" prepared by defendant's staff attorney, Thomas K. McWhorter, wherein Mr. McWhorter remarks, "The DSD [deed securing debt] of plaintiff *must* be re-executed after adding the names of the corporated [sic] officer and rerecorded. The validity of the DSD is *questionable* (emphasis in original)." Plaintiff's Exhibit 57.[3] Defendant contends that the concerns identified in Mr. McWhorter's report were

---

**2.** *Tilley* is a case on point. It is particularly compelling since that case presented no question as to the signatory's capacity as corporate president or his authority to bind the corporation. Moreover, there, as here, the signature in question appears on the line provided for the corporation but in neither case is the signatory's official capacity indicated anywhere on the face of the challenged document.

**3.** This report is dated November 19, 1985 and thus was apparently prepared over one year after the security deed was executed. As previously noted, however, the KKS loan was not assigned to defendant until September of 1986. This fact is significant since it was likely sufficient to permit defendant to reject the assignment. *See United States v. Lowell*, 557 F.2d 70, 72 (6th Cir.1977) (SBA not bound by acts of bank officials in entering into loan agreement); *see also Benson v. United States Small Business Administration*, 644 F.2d 1366, 1367–68 (9th Cir. 1981) (quoting *Lowell*).

subsequently addressed to defendant's satisfaction by its acquisition of Mr. Turem's affidavit wherein he testifies that he is in fact the signatory of the security deed. He does not, however, indicate that he signed the document as plaintiff's corporate vice president. The court finds that this evidence likewise creates a question of fact as to whether defendant knew or should have known Mr. Turem's relationship to plaintiff and/or authority to execute the security deed.

### C. *Ratification.*

 Under Georgia law, principles of agency apply to corporations and their officers. *See Jack Fred Company v. Lago,* 96 Ga.App. 675, 101 S.E.2d 165 (1957). In this regard, defendant argues that by its acts and omissions, plaintiff has ratified the execution of the security deed by Mr. Turem. The principle of ratification is codified at O.C.G.A. § 10–6–52. This section provides, "A ratification by the principal shall relate back to the act ratified and shall take effect as if originally authorized. A ratification may be express or implied from the acts or silence of the principal. A ratification once made may not be revoked."

Defendant's ratification argument fails for several reasons. First, the court has already identified a question of fact as to whether Mr. Turem was truly plaintiff's corporate vice president when he executed the security deed on its behalf. This necessarily means a question of fact also exists as to whether Mr. Turem and plaintiff maintained an agent-principal relationship at that time. Second, before ratification will be found, it must be determined that the principal possessed full knowledge of all material facts relevant to the act ratified. *See Shirley v. Couch,* 177 Ga.App. 436, 339 S.E.2d 648 (1986). In the case at bar, plaintiff has produced evidence that it had no knowledge of Mr. Turem's actions in connection with the KKS loan. Gwyn G. Turem Aff., ¶¶ 8–10. Finally, plaintiff has asserted without contradiction that it derived no benefit whatsoever from the agreement to supply collateral for the KKS loan. Under Georgia law, ratification generally requires that the principal accept and retain the benefit of the unauthorized act. *See Hyer v. Citizens and Southern National Bank,* 188 Ga.App. 452, 373 S.E.2d 391 (1988). Thus, a question of fact clearly exists as to whether plaintiff ratified Mr. Turem's execution of the security deed. For these reasons, the court concludes that neither plaintiff nor defendant has demonstrated its entitlement to judgment as a matter of law in this action. Accordingly, both motions for summary judgment are DENIED.

### III. CONCLUSION.

In sum, the parties' cross motions for summary judgment are DENIED. The parties are DIRECTED to resubmit the proposed consolidated pretrial order within thirty (30) days of receipt of this order.

SO ORDERED.

**Norman T. WALTERS, Plaintiff,**

v.

**TIME INSURANCE COMPANY, Defendant.**

**Civ. A. No. 89–1–VAL (WDO).**

United States District Court, M.D. Georgia, Valdosta Division.

May 22, 1990.

H.B. Edwards, Jr., Edwards & Edwards, O. Wayne Ellerbee, Valdosta, Ga., for plaintiff.

Young, Young & Clyatt, Samuel F. Greneker, F. Thomas Young, Valdosta, Ga., for defendant.

## ORDER

OWENS, Chief Judge.

This is a dispute over the meaning of one provision of an accident and sickness disability insurance policy issued to the plaintiff on April 13, 1978, by defendant Time Insurance Company.

As amended by a rider attached to the policy, the provision in dispute provides:

**RELATION OF EARNINGS TO INSURANCE:** If the total monthly amount of loss of time benefits promised for the same loss under all valid loss of time coverage upon the Insured, whether payable on a weekly or monthly basis, shall exceed the monthly earnings of the Insured at the time disability commenced or his average monthly earnings for the period of two years immediately preceding a disability for which claim is made, whichever is the greater, the Company will be liable only for such proportionate amount of such benefits under this policy as the amount of such monthly earnings or such average monthly earnings of the Insured bears to the total amount of monthly benefits for the same loss under all such coverage upon the Insured at the time of such disability commences and for the return of such part of the premiums paid during such two years as shall exceed the pro rate amount of the premiums for the benefits actually paid hereunder; but this shall not operate to reduce the total monthly amount of benefits payable under all such coverage upon the Insured below the sum of two hundred dollars or the sum of monthly benefits specified in such coverages, whichever is the lesser, nor shall it operate to reduce benefits other than those payable for loss of time. "Valid loss of time coverage" as used herein shall include all loss of time coverage provided by governmental agencies.

(D-2, pp. 7 and 9). The amended by rider portion is underlined.

On February 13, 1986, the plaintiff insured sent the defendant a notice of claim form (D-2, p. 10) stating that he had become disabled. Plaintiff listed his last day of work as February 10, 1986, stating that he did not plan to return to work. Preliminarily satisfied with plaintiff's claim and medical information, defendant insurance company began paying the plaintiff

$1,500.00 per month on April 13, 1986, but simultaneously began requesting information from plaintiff regarding the amount of his earnings preceding the onset of disability and any disability payments awarded by social security.

By award dated September 28, 1986, plaintiff was granted social security disability benefits of $563.60 per month (D–2, p. 33) for total disability beginning November 1, 1985 (D–2, p. 27). Upon learning of this award, defendant Time Insurance Company decreased the plaintiff's monthly benefit payment by $563.60—from $1,500.00 to $936.40—(D–2, p. 19), contending that the amended portion of the Relation of Insurance to Earnings provision, to wit: " 'Valid loss of time coverage' as used herein shall include all loss of time coverage provided by governmental agencies," decreases the insured's monthly benefit by whatever the insured receives from social security disability insurance payments. Defendant argues that social security disability insurance is "loss of time coverage provided by [a] governmental agenc[y]." The plaintiff insured disagrees.

The defendant insurer and the plaintiff by telephone and letter discussed the question of how much the plaintiff insured's normal monthly earned income was in the two years preceding disability. Plaintiff had owned and operated a subchapter-S corporation, paying himself and in whatever form—salary or dividend—his accountant said was most advantageous from a tax standpoint. Unlike those who work for others, plaintiff did not receive the usual weekly or monthly salary. Satisfied that plaintiff earned at least $900.00 per month, defendant, under the Relation of Earnings to Insurance clause, decreased plaintiff's benefits from $1,500.00 per month to $900.00 per month. In so doing, defendant company wrote plaintiff's attorney on March 13, 1987:

> Please be advised that we have fully reviewed the policy and claim submitted by Norman Thomas Walters. At this point in time we are maintaining our position that the benefit should be $900 per month and not the original $1,500 per month. Our position is based on the reviewing of records in our files that the Insured himself submitted. On a Claim Form dated and signed by the Insured dated February 13, 1986, he indicated that his last day of work was February 10, 1986. At this point in time we are basing the Insured's income on the average monthly income in the two years prior to his disability or $900 per month. On the Claim Form the Insured provided dated February 13, 1986, he did indicate that his average monthly income was $900 per month. We originally started our claim with the February 11, 1986, date of disability. At no point in time have we ever been notified that this is not the correct beginning date of total disability. We have reviewed statements submitted by Doctor Barker and Doctor Tindall which supports using the above dates for total disability.
>
> If you would like us to commence this claim prior to the February, 1986, date, we will need medical records from any provider treating the Insured to verify that the total disability should have commenced in October of 1985. We would also like a written statement from the Insured, sent through the United States mail which indicates why on a Claim Form dated February 13, 1986, he said his last date of work was February 10, 1986.
>
> If you have any questions regarding the above matter, please feel free to contact this office. Until additional information is received regarding the above matter, we will continue to provide $900 per month Disability benefits for Mr. Walters based on the Relations to Earning of Insurance provision of his policy.

(D–2, p. 55).

Plaintiff, through his lawyer, vigorously disagreed with the insurer's position, contending that the plaintiff was entitled to a monthly benefit of $1,500.00 instead of the $900.00 being paid by defendant under its interpretation and application of the Relation of Insurance to earnings provision to the insured's circumstances. Unable to convince the defendant insurance company

to increase his monthly benefits, the plaintiff filed this complaint.

Responsive pleadings were filed, a pre-trial was conducted, and a non-jury hearing was held. Briefs having been submitted and considered by the court, the case is ready for decision.

The court's task is to interpret and apply the policy provision entitled Relation of Earnings to Insurance.

Defendant urges the court to interpret the provision to mean as follows:

If the insured is promised from this policy or any other valid loss of time coverage, an amount which is greater than what the insured was making at the time of disability or greater than what he was making on average per month for the two years immediately before his disability, then the insurance coverage provided for by this policy is prorated.

The plaintiff, on the other hand, urges the court to interpret this provision so that it applies only when the insured is receiving benefits under more than one disability insurance policy. If so interpreted, the insured's monthly earnings in the two years preceding disability would not have any bearing upon the calculation of the monthly benefit to be paid.

Assuming the court agrees with the plaintiff and interprets the provision to apply only when the plaintiff insured is receiving benefits under more than one disability insurance policy, defendant insurance company urges the court to find that social security disability payments are benefits being received from a second disability insurance policy provided by the United States government and should be utilized to reduce defendant's monthly obligation to the plaintiff. Defendant contends social security disability insurance is loss of time coverage provided by a governmental agency.

### Defendant's First Contention

■ In considering defendant's first contention that the Relation of Earnings to Insurance clause should be utilized to comparatively compute monthly benefits using earnings, and arriving at a conclusion as to the meaning of that provision, this court is required by Georgia law to construe the insurance policy as a whole. *Cotton States Mutual Insurance Co. v. Hutto*, 115 Ga. App. 164, 154 S.E.2d 375 (1967). The test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean. The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney. *Nationwide Mut. Fire Ins. Co. v. Collins*, 136 Ga.App. 671, 675, 222 S.E.2d 828 (1975). "Where a provision in a policy is susceptible to two or more constructions, the court will adopt that construction which is most favorable to the insured." *Prudential Ins. Co. of Am. v. South*, 179 Ga. 653, 656, 177 S.E. 499 (1934). See also, *Welch v. Professional Ins. Corp.*, 140 Ga.App. 336, 231 S.E.2d 103 (1976).

■ Construing the policy (D–2, pp. 4–9) as a whole, the court notes that the policy benefit and premium schedule (D–2, p. 5) states:

BENEFIT AND PREMIUM SCHEDULE

| FORM | BENEFIT DESCRIPTION | | PREMIUM |
|---|---|---|---|
| 304 DISABILITY POLICY | | | $77.40 |
| MONTHLY INDEMNITY | ELIMINATION PERIOD | BENEFITS BEGIN ON | MAXIMUM PERIOD |
| ACCIDENT–$1500 | 30 CONSECUTIVE DAYS | 31ST DAY | FOR LIFE |
| SICKNESS–$1500 | 30 CONSECUTIVE DAYS | 31ST DAY | TO AGE 65 |

MAXIMUM PERIOD FOR DISABILITY COMMENCING AFTER AGE 64 SHALL BE 1 YEAR

YOUR OCCUPATION—24 MONTHS

TOTAL PREMIUM FOR 1 MONTH          $77.40

The court further notes that the provision in dispute is entitled Relation of Earnings to Insurance rather than or instead of being entitled Relation of Earnings to Monthly Indemnity or Relation of Earnings to Monthly Benefit. A reasonable person in the position of the insured upon reading this provision for the purpose of ascertaining his monthly indemnity or monthly benefit would thus first note that it's title makes no reference to monthly indemnity or monthly benefit.

A reasonable person in the position of the insured upon reading beyond the title of the provision would note the words "the Company will be liable only for such proportionate amount of such benefits under this policy as the amount of such monthly earnings ... of the Insured bears to the total amount of monthly benefits for the same loss under all such coverage upon the Insured at the time of such disability commences." After reading the above language a reasonable person would conclude (1) that the words "proportionate amount" contemplate a comparative relationship between two or more things and (2) that the things to be compared are (a) monthly benefits under this policy and (b) monthly benefits under all such coverage or policies. Since the word "all" is an adjective describing the whole, a reasonable person would discern that all such coverage refers to multiple policies. Thus, a reasonable person would conclude that this provision says that in the event the insured has and is entitled to benefits under more than one disability insurance policy, Time Insurance Company under the subject policy will be required to pay only such proportionate amount of the $1,500.00 monthly policy benefits as the amount of the insured's monthly earnings bears to the total amount of monthly benefits payable under all of the insured's disability policies. Thus, if an insured had two disability policies, each of which pays $1,500.00 per month disability benefits, and if his defined monthly earnings were $2,000.00, the $2,000.00 monthly earnings would be compared to the $3,000.00 total monthly benefits under both policies. Each policy would then be required to pay ⅔ of $1,500.00, or $1,000.00. An insured would then collect a total of $2,000.00 instead of $3,000.00.

Thus, the court concludes that the disputed clause entitled Relation of Earnings to Insurance is intended to be utilized to compute monthly benefits only when the insured is receiving benefits under more than one disability insurance policy.

The court's interpretation of the provision is supported by the Georgia Insurance Code. O.C.G.A. §§ 33–29–1 through 33–29–3 specify the provisions that must be included in an individual accident and sickness disability insurance policy. O.C.G.A. § 33–29–4 sets forth optional policy provisions which may be inserted in such a policy provided "such provisions are in the words in which the same appear in subsection (b)...."

Subsection (b) contains the following optional provisions:

 (1) Change of Occupation

 (2) Misstatement of Age

 (3) Other Insurance With This Insurer

 (4) Relation of Earnings to Insurance

 (5) Unpaid Premium

 (6) Return of Premium on Cancellation

 (7) Conformity With State Statutes

 (8) Illegal Occupation

 (9) Intoxicants and Narcotics

 (10) Cancellation of Travel Policies

Reading optional provisions (3)[1] and (4)[2] it is obvious that optional provision (3) was

---

**1.** (3) Other Insurance With This Insurer.

 (A) If an accident or sickness or accident and sickness policy or policies previously issued by the insurer to the insured is in force concurrently herewith, making the aggregate indemnity for _____ (insert type of coverage or coverages) in excess of $_____ (insert maximum limit of indemnity or indemnities), the excess insurance shall be void and all premiums paid for the excess shall be returned to the insured or to his estate;
or in lieu thereof:

 (B) Insurance effective at any one time on the insured under a like or policies with this insurer is limited to the one such policy elected by the insured, his beneficiary, or his estate, as the

inserted by the Georgia legislature to give an insurer the opportunity to define its maximum obligation to an insured who is covered by more than one policy issued by the same insurer and that optional provision (4) was inserted to give an insurer the opportunity to define its obligation to an insured who is covered by more than one policy issued by different insurers. That this clause is intended to apply only to an insured having and entitled to benefits under more than one disability insurance policy, is thus consistent with the legislative scheme from which this clause emerged.

### DEFENDANT'S SECOND CONTENTION

if social security disability benefits are encompassed by the policy language, Georgia law requires that the definition of valid loss of time coverage be approved as to form by the Insurance Commissioner and defendant insurer has not shown approval by the Commissioner. Therefore, the definition of "valid loss of time coverage" is invalid and not applicable to this insured and his policy. The Commissioner's approval, of course, is relevant only if the definition is found to encompass social security disability payments.

As an initial matter, the court does not question the fact that if the policy so provided defendant could use plaintiff's social security benefits to offset the benefits provided in its insurance policy. However, the policy does not so provide. Again, the construction of the Relation of Earnings to Insurance provision will determine the resolution of this issue.

O.C.G.A. § 33–29–4(b)(4)(B) provides in relevant part:

---

case may be, and the insurer will return all premiums paid for all other policies.